UNITED HOTELS OF PUERTO RICO, INC., Plaintiff and Appellee, *v.* MARVIN WILLIG, Defendant and Appellant.

No. R-62-275.        Decided October 9, 1963.

*Gutiérrez & Ramírez, Carlos G. Látimer,* and *Luis Fernández Ramírez* for appellant. *Montilla & Benítez* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Rigau.

MR. JUSTICE RIGAU delivered the opinion of the Court.

Defendant is an attorney at law and practices his profession in Washington, D.C. Late in 1956 and early in 1957 he sojourned for long periods in Puerto Rico on business. During his stays in Puerto Rico he frequented the casino of the Condado Hotel, owned by plaintiff. During his visits to the casino of that hotel defendant purchased chips and gambled. On certain occasions, the trial court concluded, defendant won, redeemed the chips which he had purchased, and withdrew for the rest of the night taking the gains with him. On other occasions he lost and then obtained credit from the casino, signing different obligations binding himself to pay the amount due the casino.[1] Defendant's total debt amounted to $39,365, which amount was afterwards reduced to $37,990. During the aforesaid period defendant also frequented the casinos of Caribe Hilton Hotel, Flamboyán Club, and other hotels. The trial court further concluded that defendant also gambled in different casinos in the United States, including those of Las Vegas, in Nevada.

Upon failure to receive payment of the debt plaintiff sued for collection of money. In his answer defendant admitted "that during the period of time therein mentioned . . . he drew checks for the amount claimed in the complaint in payment of game debts incurred in a casino operated by plaintiff." As special defenses he alleged, briefly, that those checks were drawn without valid consideration; that plaintiff cannot collect the debt because it is not permitted by law; and, in the alternative, that the court ought to reduce the amount of the debt. The case having been heard, the Superior Court

---

[1] Casinos are authorized to extend credit to players by the Regulations of the Secretary of the Treasury, 15 R.&R.P.R. § 76a–7(h).

ordered defendant to pay to plaintiff the sum of $37,990, plus the costs and $1,000 for attorney's fees.

■ Appellant assigns five errors before this Court. Since they are closely related to each other, he discusses jointly the first three and we shall do likewise. In the first three errors appellant alleges that the court erred in granting the relief sought by plaintiff, since the law does not permit action to claim what one wins in a game of chance, and to that effect he cites § 1698 of the Civil Code, 31 L.P.R.A. § 4771, which in his opinion so provides with crystal clearness. Since defendant wagered on games permitted by the law in Puerto Rico (as we shall see later), it will probably suffice to point out that the same Code, three sections further on (in its § 1701) also provides equally clearly that "A person who loses in a game or bet *which is not prohibited* is civilly liable." (Italics ours.) But it will not suffice to mention only the foregoing because in our opinion Law is not only *fiat* but also reasoning.[2]

---

[2] We say "law" (in Spanish ":derecho," in French "droit," in Italian "diritto," in German "Recht," in Latin "ius") bearing in mind the difference between that term and "a law" in Spanish "ley," in French "loi," in Italian "legge," in German "Gesetz," in Latin "lex"), because a law, the product of legislative organs (Legislative Assembly, Congress, Parliament, etc.) may only be *fiat*, although, of course, within the constitutional sphere in which that organ operates. (*"Potestas in populo, auctoritas in senatu,"* said Cicero, *De Legibus,* III, 12.) However, Law not only has a content of legality but also an ethical content. We must keep in mind the fundamental role of the Greek "epiqueya" and of the Roman equity in the history of law, an influence that is still vigorous in our times. The subject is very interesting and displays the common sources of certain great tendencies in the Anglo-Saxon and civil or European continental law. We must bear in mind that, after all, the first English chancellors were ecclesiastics and through them the Anglo-Saxon law received considerable influence from the canonical and Roman law. Thus, it may not seem strange that the English equity, applied originally by chancellors of ecclesiastical origin, had its roots in the Roman canonical "aequitas," of which it is a continuation. For the Romans, Stammler has written, the law was "the art of what is right and equitable," *Tratado de Filosofía del Derecho,* Spanish translation by Roces, Madrid, Editorial Reus, 1930, p. 29. For an excellent résumé of the history of equity from Rome to our

On this question of games of chance the general rule underlying our legislation is that games of luck or chance are prohibited, but, naturally, they are prohibited by law, which means that also by law there may be, and there are, exceptions to that rule. The Penal Code prohibits in § 299 "any game of chance played with cards, dice or any device," 33 L.P.R.A. § 1241, and the Civil Code in § 1699 provides that "bets analogous to prohibited games are considered as prohibited," 31 L.P.R.A. § 4772. The law also prohibits lotteries or raffles, "bolita," "bolipool," and other variants of those games, 33 L.P.R.A. §§ 1211–59.

As exceptions to the general rule mentioned, the law permits bingos for charity or educational purposes in churches and lodges, 15 L.P.R.A. §§ 151–57, creates an official lottery, part of the net proceeds of which is covered into the public treasury and part into the municipalities, 15 L.P.R.A. §§ 111–28, and by Act No. 221 of May 15, 1948 games of chance are authorized in gambling rooms operated under a

---

times, see Castán, *La Formulación Judicial del Derecho*, 2d. ed., 1954, Editorial Reus, Madrid, pp. 35–95. For a recognition of the Roman influence made by a distinguished scholar of the common-law world, see Ch. III of McIlwain, *Constitutionalism Ancient and Modern*, Cornell University Press, 1940. For example:

"There is probably no other social revolution in recorded history so important, so complete, so continuous over so long a period, as this evolution traceable step by step in the sources of Roman private law. We find institutions of an age long bygone still preserved in a law that is binding, but alongside it an actual administration enforcing principles often in many ways more advanced than those embodied in our own modern codes. . . . The modern sociological school of jurists might, if they cared to look for it, find the strongest support for their theories in this remarkable evolution of Roman law." McIlwain *op. cit.* at p. 54.

As stated at the beginning of this footnote, in English the word "law" includes both concepts: "law" and "a law". Of course, the English language also has the word "statute" for law. But it does not have the equivalent of "law," "droit," etc. The difficulty which this deficiency, as termed by Pound, in the Anglo-Saxon juridical vocabulary has created in the juridical literature in English has been considered by said author. See Pound, Law Finding Through Experience and Reason 3 (1960). See, also, by the same author, Jurisprudence, I, 12; and II, 8.

license issued in accordance with the provisions of that Act, 15 L.P.R.A. §§ 71–84.

The casino where defendant gambled is one of those operated by a tourism hotel, in San Juan, under the provisions of Act No. 221 *supra*. The Act declares in the statement of motives the following:

"The purpose of this Act is to contribute to the development of tourism by means of the authorization of certain games of chance which are customary in the recreation places of the great tourist centers of the world, and by the establishment of regulations for and the strict surveillance of said games by the government, in order to ensure for tourists the best possible safeguards, while at the same time opening for the Treasurer of Puerto Rico an additional source of income." Laws of Puerto Rico of 1948, p. 750.

Act No. 221 and the regulations promulgated thereunder impose strict conditions and regulations and stringent surveillance by the government for the granting and operation of gambling rooms. The licenses are issued by the Secretary of the Treasury after approval by the Economic Development Administration. The licensees must own and operate a hotel, restaurant, or amusement place for tourists; must not have been convicted of a felony or misdemeanor involving moral turpitude; must enjoy a good standing, and if they are artificial persons, all the stockholders or partners must also comply with these personal requirements. The applications for license shall be made under oath showing that they meet the requirements of law, and there shall be published in a newspaper of general circulation in Puerto Rico, once a week for four weeks, a notice stating the fact of the application, the name of the applicant and of the hotel or place where the gambling room is to be operated.

The license is nontransferable. The acquirer or lessee of a gambling room shall apply for a new license and comply with the legal requirements. If the licensee is an artificial

person, any transfer of any share or interest therein shall be notified in writing to the Secretary of the Treasury and to the Development Administration. Failure to give such notice or the concealment of the true owner or owners of a gambling room, or of any share or participation in the artificial person holding the license, shall entail the cancellation of the license.

The Development Administration inspectors have free access to the gambling room, its equipment and its books, 15 R.&R.P.R. § 76–16, and the gambling rooms are under the duty to furnish to the Economic Development Administrator any information which the latter may request in connection with the gambling rooms, their operation, their employees, their owners and stockholders, 15 R.&R.P.R. § 76a–1(6). Gambling rooms are not permitted to advertise to the public or to admit persons under 18 years of age. In the different games the regulations establish a limit for the bets; the Regulations of the Economic Development Administration divide the Island into several zones and prescribe the requirements of investment which the applicants must make to warrant a license, in addition to complying with the legal requirements and regulations, and they determine the annual fees which the gambling rooms shall pay to the State for their operation. The Regulations of the Economic Development Administration referred to above, 15 R.&R.P.R. §§ 76–1 to 76–22, and the Regulations of the Secretary of the Treasury, 15 R.&R.P.R. §§ 76–201 to 76–219, exist by operation of the law.

In order to obtain a license in Zone No. 1, which is the zone where plaintiff's gambling room is located, the Regulations of the Economic Development Administration require that the licensee own a hotel or hotels having a minimum of 300 rooms, or the cost of which shall not be less than $5,000,000, 15 R.&R.P.R. § 76–9(1). The gambling rooms

located in that zone pay a license fee of $24,000 a year, 15 L.P.R.A. § 76(2).

Every day that the gambling parlor is open to the public every licensee must have a sum of not less than $25,000 in cash and ready money in its vault, 15 R.&R.P.R. § 76-21, and the cashier shall redeem the chips to the bearer in legal tender, 15 R.&R.P.R. § 76a-7(d). The foregoing are not all the conditions and requisites which the law and the regulations require of the casinos, but only some which we have selected to show the fiscalization to which these enterprises are subjected by the State. Hereinafter we shall refer to the foregoing. Let us return for a moment to the Civil Code and to Act No. 221.

As we stated in *Serra* v. *Salesian Society*, 84 P.R.R. 311 (1961), the provision of § 1698 of the Civil Code in the sense that the law does not permit any action to claim what is won in a game of chance, "refers to prohibited games; the Code clarifies in its § 1701 that a person who loses in a game or a bet which is not prohibited is civilly liable." Already since 1903, in *Chevremont et al.* v. *The People of Porto Rico*, 3 P.R.R. 215, we held that the holders of tickets of the provincial lottery had a cause of action in law. Subsequently we have upheld the principle, *Fuentes* v. *John Doe*, 84 P.R.R. 486 (1962), and in *In re Mieres Calimano, Pros. Atty., and Pagán,* 76 P.R.R. 656 (1954). In *Mieres and Pagán, supra,* we upheld the owner's right to the prize of a winning ticket. Time and again we have held that a cause of action accrues in cases involving racing bets, *Díaz* v. *El Comandante Racetrack*, 87 P.R.R. 771 (1963); *Axtmayer* v. *Las Monjas, Etc.*, 54 P.R.R. 198 (1939); *Fernández* v. *Las Monjas Racing Corp.*, 52 P.R.R. 761 (1938); *Torres* v. *Porto Rico Racing Corp.*, 40 P.R.R. 423 (1930); *Manzanares* v. *P.R. Racing Corp.*, 38 P.R.R. 730 (1928); *Felicie* v. *P.R. Racing Corp.*, 38 P.R.R. 423 (1928).

■ Even in the absence of the provisions of § 1701 of the Civil Code in the sense that a person who loses in a game which is not prohibited is civilly liable, which section is sufficient for the decision of this case, our interpretation would be that Act No. 221 of 1948, enacted by the Legislative Assembly 46 years after the Civil Code, has the effect of an implied amendment to § 1698 of the Civil Code. Laws which refer to the same matter, or whose object is the same, shall be interpreted with reference to each other, in order that what is clear in one may be employed for the purpose of explaining what is doubtful in another. Section 18 of the Civil Code, 31 L.P.R.A. § 18. However, it is not necessary to resort to the argument of implied amendment since, as we have already pointed out, § 1701 of the Civil Code provides that a person who loses in a game which is not prohibited is civilly liable.

■ Furthermore, it is not possible to impute to the Government of Puerto Rico the untenable position that, while on the one hand, it requires certain persons, as a condition for the granting of a game license, to invest not less than $5,000,000 or its equivalent in the construction of a hotel of not less than 300 rooms, the maintenance of a tourism hotel within the most strict norms of the branch, while it charges $24,000 annually for such license, while it requires them to pay in cash to the players who win in the casino, and while it authorizes them expressly by regulation having the force of law to extend credit to the bettors, on the other hand that whenever these persons who have complied with these conditions and paid those moneys find it necessary to resort to the State, through the judicial branch, in order to assert their rights created by law, the State should then assume the position that those persons have no remedy at law. The law does not conceive that persons take justice by their hand nor permits, as long as it is possible to prevent

it, gaps in the law. If any appear in the legislation, they are supplied by the case law. The first three errors assigned were not committed. Defendant played games permitted by law and was civilly liable, § 1701 of the Civil Code, 31 L.P.R.A. § 4774.

In a somewhat similar situation the Supreme Court of Spain decided in the same sense we have done here and employed a reasoning similar to ours. The court said:

". . . [I]t would be conflicting in the moral order, which is the order governing the legality of the acts, to consider as contrary to the former the performance of any act authorized by the lawmaker, wherefore the stock exchange operations which comply with the provisions of § 74 of the Code of Commerce cannot be deemed to be comprised within the prohibitions of the Civil Code." Judgment of December 26, 1905.

■ In the fourth error assigned it is alleged that the court erred in sustaining the complaint or, in the alternative, in not reducing the amount of the debt. We do not agree. The second paragraph of § 1701 of the Civil Code, 31 L.P.R.A. § 4774, is not mandatory but discretionary. It provides that the judicial authority *may* reduce the obligation, etc.; it does not say that it *must*. The Superior Court exercised its discretion, and in view of the circumstances of this case there is no reason to warrant our intervention in the valid exercise of discretion used by the Superior Court. Defendant is quite a habitual gambler; he collected the gains in cash and signed obligations when he lost; he is not an ignorant person to warrant the court's paternal attitude; he is a practising lawyer in one of the world's largest cities. The error assigned was not committed.

■ It is alleged in the fifth error that the court erred in ordering appellant to pay $1,000 for attorney's fees, since appellant has not been obstinate in litigating. We are of the opinion that this error was committed. After all, the ques-

tion had not been decided heretofore. *Santaella* v. *Licari*, 83 P.R.R. 855, 870 *in fine* (1961).

The judgment rendered by the Superior Court, San Juan Part, on October 9, 1962 will be modified eliminating the pronouncement ordering defendant to pay to plaintiff $1,000 for attorney's fees, and as thus modified it will be affirmed.